## Case No. 18,273.

### CHARGE TO GRAND JURY—TREASON.

[1 Spr. 602; 23 Law Rep. 705.] [1]

District Court, D. Massachusetts. March, 1861.

CONSTITUTIONAL LAW — SUPREMACY OF NATIONAL GOVERNMENT — RESISTANCE BY STATES TO ENFORCEMENT OF LAWS—WHAT CONSTITUTES TREASON—JURISDICTION OF NATIONAL COURTS— MODES OF PROCEDURE—QUALIFICATIONS AND SELECTION OF JURORS.

[1. The government of the United States is not a mere confederacy. It is, on the contrary, a government possessing the highest attributes of sovereignty, embracing a legislature to enact laws, a judiciary to expound them, and an executive to enforce them. These laws, within the sphere of their operation, act directly upon individuals, and are paramount authority over all the territory of every state. They cannot be annulled, nor the force of any of them be in any degree impaired, by any state law, constitution, ordinance, or resolve.]

[2. The Criminal Code of the United States is in full force over all persons and places within every state of the Union, notwithstanding any attempt to invalidate it by any organization, whether in the form of state legislatures, conventions, or other voluntary associations.]

[3. If a body of men be actually assembled for the purpose of effecting a treasonable purpose by force, that is levying war. But it must be an assemblage in force, a military assemblage in a condition to make war.]

SPRAGUE, District Judge (charging grand jury). It is the duty of the court to give you some instructions upon the criminal jurisprudence of the United States.

The times invite especial attention to that branch which relates to resistance to the laws, and endeavors to subvert the national authority.

The government of the United States is often spoken of as if it were a mere confederacy. This is a fundamental and dangerous error. We had a confederacy during the Revolution, but when the external pressure of a foreign war was removed, its inherent weakness was such as to render it indispensable that a government should be substituted in its stead. This was achieved by the constitution of the United States. It emphatically established a government with the highest attributes of sovereignty, embracing a legislature to enact laws, a judiciary to expound them, and an executive to enforce them. These laws operate directly upon individuals. The several states also have a power of legislation within their respective limits.

Thus, in our complex system, we have two governments, each with a power of legislation over the same territory, and acting upon the same persons. The danger of a conflict of laws from these two sources was palpable, and our fathers wisely and carefully provided against it. They marked out the sphere of the general government with all practicable clearness and precision, and within that sphere made its power supreme. This supremacy was not left to inference, but is provided for in the most explicit terms.

Article 6 says: "This constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges, in every state, shall be bound thereby, anything in the constitution

or laws of any state to the contrary notwithstanding."

Thus the constitution and laws of the United States extend and are paramount over all the territory of every state, and cannot be annulled, nor the force of either of them be in any degree impaired by any law of a state, no matter in what form or with what solemnity, such law may have been enacted, or by what name it may be designated; whether it be a constitution, an ordinance, a statute, or a resolve. So far as it conflicts with the constitution, or with any valid law of the United States, it is utterly nugatory, and can afford no legal protection whatever to those who act under it. The Criminal Code of the United States is, therefore, in full force over all persons and places within the limits of the thirty-four states, notwithstanding any attempt to invalidate them by any organization, whether in the form of state legislatures, conventions, or other voluntary associations.

The highest crime known to our law is treason. This offence is defined by the constitution itself in the following words:

"Treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort." [Article 3, § 3.]

These terms, "levying war," "adhering to enemies," "giving them aid and comfort," were not new. They had been well known in English jurisprudence at least as far back as the reign of Edw. III. They had been frequently the subject of judicial exposition, and their meaning was to a great extent well settled.

The question what amounts to levying war, arose soon after the adoption of our constitution, in the several trials of Mitchell [Case No. 15,788], Vigol [Id. 16,621], and Fries [Id. 5,127], for being engaged in the Pennsylvania insurrection against the law imposing a duty upon distilled spirits, under the administration of Washington, and subsequently in the trial of Aaron Burr, in the year 1807 [Id. 14,693], and in the case of U. S. v. Hoxie [Id. 15,407], in the year 1808. These were trials in the circuit court.

The only case which has come before the supreme court, was that of Ex parte Bollman, 4 Cranch [8 U. S.] 125. It is settled that if a body of men be actually assembled for the purpose of effecting a treasonable purpose by force, that is levying war. But it must be an assemblage in force, a military assemblage in a condition to make war. U. S. v. Burr [Case No. 14,693]. A mere conspiracy to overthrow the government, however atrocious such conspiracy may be, does not of itself amount to the crime of treason. Thus, if a convention, legislature, junto, or other assemblage, entertain the purpose of subverting the government, and to that end pass acts, resolves, ordinances or decrees, even with the view of raising a military force to carry their purpose into effect, this alone does not constitute a levying of war.

What is a treasonable purpose? If the object be to prevent by force the execution of any public law of the United States, generally and in all cases, that is a treasonable purpose, for it is entirely to overthrow the government as to one of its laws. And if there be such an assemblage as I have already described, for the purpose of carrying such an intention into effect by force, it will constitute levying war.

But the sudden outbreak of a mob, or the assembling of men in order, by force, to defeat the execution of the law, in a particular instance, and then to disperse, without the intention to continue together, or to re-assemble for the purpose of defeating the law generally, in all cases, is not levying war.

If the purpose be entirely to overthrow the government at any one place, by force, that is a treasonable purpose.

This was the well known law before the adoption of our constitution, and has been affirmed by the supreme court of the United

[1] [Reprinted by permission.]

States in Ex parte Bollman [supra]. The place to which that case had reference was New Orleans.

And if a body of men be actually assembled in force, in a condition to make war, in order to overturn the government at any one place by force, that is levying war. Nor is it necessary that the assemblage should be with military arms and array—numbers may supply the requisite force.

If any such assemblage for the purpose of subverting the government at any place, take forcible possession of any fort, arsenal, or other property of the United States, it is a still more flagrant act of levying war.

If such acts have been committed anywhere within the United States, it may become a material inquiry, how far persons, who are not present with the body of men so assembled, may, although distant, be involved in the guilt, and subject to the penalties, of treason. If war be actually levied, "All those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors." Ex parte Bollman, 4 Cranch [8 U. S.] 126.

Thus far the law has been decided by the highest authority. I do not think it necessary, on this occasion, to go farther and inquire to what extent the English doctrines are to be followed under our definition of treason.

Thus if a person in league with those who are levying war send them arms, provisions, money or intelligence for the purpose of aiding them, he may be a traitor, however distant from the place of their assemblage.

Therefore, if the actual assemblage be at Charleston or at New Orleans, any person owing allegiance to the United States, however distant he may be, may become a traitor by being in conspiracy with them, and rendering them assistance. It is possible, therefore, that such acts may be within the jurisdiction of this court, so far as to be proper subjects for your investigation.

The constitution has not only defined the crime of treason, but prescribed a rule of evidence: "No person shall be convicted of treason, unless on the testimony of two witnesses to the same overt act, or on confession in open court."

The reason of these extraordinary safeguards is to be found in the nature of the offence, and in the pages of history. An attempt to overthrow the government excites the deepest indignation in great numbers, especially in those who are imbued with a warm and devoted patriotism, the cherished sentiment of a life-time, strengthened by a matured conviction of the vastness of the interests which are wrapped up in the inviolability of the sovereign power, that power which is the guardian of their safety, the daily dispenser of blessings, and the object of their prayers. A traitorous assault upon it arouses the strongest passions, and in the keenness of their resentment, and the eager pursuit of the guilty, they are apt to break down the barriers which are essential to the protection of innocence. Our fathers, therefore, endeavored to render some of these safeguards impregnable, by imbedding them in the fundamental law.

By the constitution, treason, or other crime committed within the limits of the United States, can be tried only within the state and judicial district within which it was committed; and the accused has the right to a trial by jury in such state and district.

If, therefore, treason has been committed at Charleston or at New Orleans, it can be tried only by a jury in South Carolina or Louisiana.

And if the condition of either of those states be such that the judicial tribunals of the United States cannot or will not perform their functions, crimes there committed, however atrocious, cannot be punished by the regular administration of justice.

The laws themselves are equally valid and equally paramount, notwithstanding the recreancy of the agents by whom they should be enforced.

Congress may provide a more efficient judicial system than that which now exists.

They have heretofore adopted some of the state laws and modes of procedure, and especially those which prescribe the qualifications of jurors, and the mode in which they shall be elected or summoned. This is wise, as conducive to harmony and convenience, so long as justice can thus be duly administered.

But the United States are under no necessity of conforming to state law, or of using any part of its machinery.

It is competent for the national legislature to prescribe the qualifications of jurors, and the manner in which they shall be selected and summoned. They may even authorize the marshal himself to select suitable persons. Indeed, congress may make their judicial system complete for the independent exercise of all its functions.

As we have seen, treason may be committed at places remote from the seat of the rebellion, by co-operating with the rebels and sending them arms, intelligence, or intentionally rendering other assistance, and the trial of such offence will be had in the state and district where committed.

As to offences committed without the limits of the United States, it is left to the national legislature to determine in what place they shall be tried, and this power they have exercised by St. 1790, c. 9, § 8 [1 Stat. 113], and St. 1825, c. 65, § 14 [4 Stat. 118], which provide that the trial of all offences which shall be committed upon the high seas, or elsewhere, out of the limits of any state or district, shall be in the district where the offender is apprehended, or into which he may be first brought.

Congress may alter these statutes, and provide other places for the trial of such offences, whenever the public safety or welfare may, in their judgment, render it proper; but as the law now stands, when a crime has been committed on the high seas, or in any place not within any state or district, if the offender has been legally arrested without the limits of the United States, and brought in custody into any judicial district, he is to be tried in such district.

But if he has not been so brought into the United States, he must be tried in the district in which he is apprehended.

Any person owing allegiance to the United States, may subject himself to the penalties of treason. St. 1790, c. 9, § 1.

Allegiance is of two kinds: that due from citizens, and that due from aliens resident within the United States. Every sojourner who enjoys our protection, is bound to good faith toward our government, and although an alien, he may be guilty of treason by co-operating either with rebels or foreign enemies.

The allegiance of aliens is local, and terminates when they leave our country. That of citizens is not so limited—although the European doctrine of indissoluble and perpetual allegiance has not been accepted in this country.

There are minor offences created by acts of congress.

Misprision of treason is defined by St. 1790, c. 9, § 2, which declares that if any person having knowledge of the commission of any treason, "shall conceal, and not, as soon as may be, disclose and make known the same to the president of the United States, or some one of the judges thereof, or to the president or governor of a particular state, or some one of the judges or justices thereof," such person, on conviction, shall be subject to fine and imprisonment.

By section 22, of the same statute, it is made a criminal offence knowingly and wil-

fully to obstruct, resist, or oppose any officer of the United States, in serving or attempting to serve or execute any order of any court of the United States, or any legal or judicial writ or process whatever, or to assault, beat, or wound any officer or other person duly authorized in serving or executing any such order or process.

By St. 1831, c. 99, § 2 [4 Stat. 488], it is enacted that, if any person shall corruptly, or by threats or force, endeavor to influence, intimidate, or impede any juror, witness, or officer, in any court of the United States, in the discharge of his duty, or shall corruptly, or by threats or force, obstruct or impede, the due administration of justice therein, every person so offending shall be liable to prosecution therefor by indictment.

Such are the criminal offences which have been created by the constitution and acts of congress, for the preservation of the government and the effectual execution of its laws.

It has been, at a former period, and is now a momentous question, whether, under our complex system, there is any power extrinsic to that of the national government by which its laws can be rightfully resisted, or their obligation impaired. There is no such power.

As I have already said to you, the authority of the United States, within their sphere, is supreme. This is a vital principle. It was so regarded by the framers of the constitution, and they have secured it in the most explicit and emphatic terms. This constitution, and the laws made pursuant thereto, shall be the supreme law of the land. And to render this effectual, they provided that the government which they created should be the final judge of the extent of its own powers and the meaning of its own laws. And to this end, they established a judicial department as a co-ordinate branch of the government, to expound and enforce the provisions of the constitution and the acts of congress. Nor is this all. In order that the laws of the United States should be practically as well as theoretically supreme, they created an executive department, clothed with full power to enforce the laws. And thus a government, paramount in all its departments, was established.

This supremacy has not always been acquiesced in. The legislation of a great country can never meet with universal approbation. And it has sometimes happened that acts of congress have been adverse to the opinions or supposed interests of many persons, sometimes constituting a majority in particular states.

And in such cases, unwilling to submit, they have eagerly sought for some mode of resistance which should wear the semblance of legality, and to this end have invoked state interposition, and the cover of state authority.

Such was nullification. That doctrine did not deny the paramount obligation of laws constitutionally enacted, but it arrogated for a state the right to determine, in the last resort, whether a law was constitutional or not. It sought to overthrow the judicial power by denying its supremacy, and claimed for every state the right to judge of the extent of the powers of the general government, and of the validity of its laws, and to limit, restrain, or annul them, according to the views of each state.

This doctrine, once formidable, has now few adherents.

Some of the adversaries of national legislation, while conceding the supremacy of the legislative and judicial departments, have sought to render their decrees nugatory by impairing the executive power, by which alone they can be carried into practical effect. And to this end also they have invoked state interference, or assumed the garb of state authority. Some believe that the attempt thus to impair the action of the executive officers of the United States has not been wholly without success.

30 Fed.Cas.—66

It seems now to be admitted, that if an United States marshal hold a legal precept, commanding him to arrest a person, or take an article of property, if such person or property be in the custody of a sheriff under a state process to enforce even a subordinate right, the marshal cannot execute his precept, but that the person and the property, although within his district, are beyond his reach, so long as the custody of the sheriff shall continue. This I understand to be the decision of the supreme court of the United States, in the absence of any act of congress upon the subject. Taylor v. Carryl, 20 How. [61 U. S.] 583.

This conclusion has been reached by assuming that the governments or jurisdictions under which the marshal and sheriff respectively act, are not only distinct, but in this respect have equal and co-ordinate authority, and thence inferring that the one who first gets actual possession, under his precept, is to retain the custody against the other, without regard to the character of the laws under which they respectively act. And it has also been held, that if a writ of habeas corpus, from a state magistrate or tribunal, be directed to an United States marshal, he is to make return stating the authority by which he holds his prisoner. He is not to produce the body, but to state the reason why he declines to do so. Ableman v. Booth and U. S. v. Booth, 21 How. [62 U. S.] 506.

This conclusion has been adopted as a measure of peace, and as a plain and practical mode of preventing contest and violence between executive officers holding conflicting precepts from their respective superiors.

The adoption of such a rule manifests moderation and abstinence on the part of the national authorities. And yet there are those who think that this is not conceding enough, but that a prisoner held by a marshal, under a legal precept of the United States, may be taken from his custody by a sheriff holding a state process. Some have supposed that this could be accomplished by putting into the hands of the sheriff a capias writ, commanding him to take the prisoner therein described, and giving such writ the name of habeas corpus.

Again, it has been supposed that the custody of the marshal could be divested, and all his power ended, by handing to the sheriff a warrant to arrest the person upon some criminal charge. As if the name or nature of a state law could make it potent enough to defeat the execution of a valid law of the United States.

The constitution, in the positive language already quoted, makes such laws supreme, without limitation or exception. This of itself is sufficient.

But it does not stop even there, but in anticipation of attempts to set up adverse state authority, it adds these emphatic words, "anything in the constitution or laws of any state to the contrary notwithstanding." And thus every law of a state, civil or criminal, organic or ordinary, is rendered subordinate to the legitimate legislation of congress, and must recede before the action of the general government in its appropriate sphere.

The disaffected, at different times, and in various sections of the Union, have earnestly sought for some legal mode of resisting legitimate authority. But it has been in vain. There is no such anomalous middle ground between submission and rebellion; and this last extreme has at length been reached. Secession is but another name for revolution; for it is vain to contend for a constitutional right to overthrow the constitution, and a legal right to destroy all law.

It is often said, that the constitution does not contemplate making war upon a state. If by this is meant only that a state, as a political body, is not to be compelled to execute the laws of the United States, it is true, because those

laws act directly upon individuals, and are not to be enforced by state authority, but by national instrumentalities.

In other words, we have a government, and not a mere confederacy.

But if, by the proposition that the constitution does not contemplate war upon a state, is meant that the authority of the United States cannot be maintained, or its laws enforced, if a state organization interpose to annul them, or protect its citizens in doing so, nothing can be more erroneous. The constitution unquestionably contemplates this very contingency of adverse state interposition or legislation, and provides against it, and for the national supremacy, in the clear and imperative language which has already been quoted. This supremacy may be maintained by the whole physical force of the nation, and whoever offends against the law, is subject to its penalties, in whatever official robes or insignia he may be clothed, or whatever state parchments he may hold in his hand.

Congress has the right to declare war. With this high prerogative they are invested in express terms, and without limitation or condition. Its exercise is left to their uncontrolled discretion.

The national legislature, therefore, may make war whenever that dread calamity is an appropriate means of sustaining the rights of the nation.

I have endeavored, gentlemen, to give you a judicial exposition of some laws to which the attention of a jury has rarely been called. In explaining their validity and extent, I have necessarily said something of the powers of the government for the maintenance of their own authority. I have confined myself to vindicating the existence of those powers, and your duty to inquire into and present offences under them. And I wish to say with emphasis, that I am not intended to indicate any opinion as to the time or manner in which they should be exercised by other departments, much less to stimulate any action. It is for them, in their wisdom, to decide when and how the high trust confided to them shall be executed. It is for the legislature and the executive, upon their grave responsibility, to determine when the great and permanent interests of the nation require them to put forth their strength, and when to exercise the more difficult virtue of a firm forbearance.